ANNA E. OSBORNE, petitioner-appellant.

*v.*

CARROLL A. OSBORNE, defendant-respondent.

[Submitted February 2d, 1937. Decided April 30th, 1937.]

*Mr. Lester C. Leonard (Mr. Sherman A. Manning,* of counsel), for the appellant.

*Messrs. Quinn, Parsons & Doremus (Mr. John J. Quinn,* of counsel), for the respondent.

The opinion of the court was delivered by

RAFFERTY, J.

Appellant, petitioner below, instituted suit for divorce against respondent, defendant below, alleging adultery. Defendant denied the charge of adultery and counter-claimed for an annulment of the marriage on the ground of fraud. Petitioner, answering the counter-claim, denied the allegations of fraud and alleged defendant had knowledge of the condition complained of prior to entering into the marriage relation.

Upon hearing of the matter, the learned advisory master advised a decree *nisi,* dismissing the petition for divorce and awarding an annulment to defendant on his counter-claim.

The appeal is from this decree.

The amended petition alleges that defendant committed adultery on January 18th, 1933, and March 15th, 1933, at a hotel in Asbury Park, Monmouth county, and on May 15th, 1933, and May 16th, 1933, in the borough of Monmouth Beach, Monmouth county.

The proofs supporting these allegations are that on the first two dates mentioned, defendant registered at the hotel, in one instance as "Mr. and Mrs. B. H. Johnson," and in

the other instance as "B. H. Johnson and wife." Defendant admitted this to be the fact and admitted also that the handwriting on the hotel register cards was his own. The register card for January 18th, 1933, shows that registration to have been made at four-forty-two P. M., while the register card for March 15th, 1933, is stamped at seven-twenty-eight P. M. Defendant explained these registrations by testifying that as a commanding officer of the coast guard he frequently had information conveyed to him concerning smuggling activities and that it was necessary that this information be given and received in the greatest of secrecy. He stated that the registrations mentioned were made at the instance and in accordance with the directions of a woman who telephoned him stating she had valuable information for the coast guard and that defendant should go to the hotel and register in the manner referred to, that in pursuance to these telephone calls he made the registrations and kept the appointments, but that on each occasion the volunteer informant failed to make an appearance. Although defendant disbursed moneys in this work done on behalf of the government and was necessarily away from the station over which he had command during the time consumed in the keeping of these appointments, he made no report thereof to his superior officers, nor did he bill the government for his expenditures and has never been reimbursed therefor. It is an instance worthy of note, in view of what is hereafter to be said, that defendant and the person alleged as being the co-respondent on all of these occasions charged, was seen by the brother of petitioner in an automobile a short distance from Asbury Park at about six o'clock on the evening of March 15th, 1933, the alleged co-respondent driving the automobile of defendant. It was in proof that while petitioner and defendant were attending a dance at a country club at Orange, New Jersey, during April, 1933, defendant left the dance with another woman and, petitioner, in searching for defendant, found him and this other woman in the back seat of an automobile in amorous pose. On the night of May 12th, 1933, petitioner and several other witnesses observed defendant and co-respondent in

affectionate embrace in an automobile parked at a freight station near Monmouth Beach. On the night of May 15th, 1933, petitioner and her witnesses testified, they observed the co-respondent leaving defendant's automobile near a vacant property close by the coast guard station, the keys of which property admittedly were in the possession of defendant, and that co-respondent there met defendant, with whom she entered the premises by a rear door and she and defendant remained within the property for a long period of time. Witnesses for petitioner admitted that they did not break into the property because they had been warned by petitioner that defendant habitually carried a weapon. The witnesses for the petitioner as to these occurrences in May, 1933, were herself, her brother, several friends and one Roswell, formerly a subordinate of defendant, but at the time of the trial stationed at Mobile, Alabama. Roswell, appearing voluntarily to testify, also stated that while a subordinate of defendant, he did, frequently, at the request of defendant, call a certain telephone number and make appointments for defendant with a woman who answered that number. At the trial the co-respondent, who testified in behalf of defendant, admitted that the telephone number was her own.

In defense of these matters alleged to have occurred in May, 1933, defendant made vigorous denial and was supported as to his activities on the dates and at the times specified by several subordinates from the coast guard station. The co-respondent, testifying for defendant, gave alibi as to her whereabouts at these times and was supported by her father and husband, the husband testifying that he was employed as a motion picture operator and at the times mentioned worked until eleven o'clock at night and arrived at his home shortly thereafter. This witness testified that after midnight of May 15th, 1933, he received a telephone call from his wife and went to her mother's home and met her there. The father testified that on May 12th, 1933, he, with his wife and daughter, attended a parade of a service organization and on May 15th, 1933, he, with his daughter, attended a political meeting in Monmouth county and at this meeting,

which was a meeting for colored voters, co-respondent sat in a front seat with several white persons throughout the evening. The mother of co-respondent did not appear to testify, nor was the testimony of the father and co-respondent as to attendance at the parade and at the political meeting substantiated by any disinterested party who attended either of these functions, particularly any of the several white persons who sat with co-respondent throughout the meeting of colored voters on May 15th, although the father testified that he introduced his daughter to a number of persons on both of these occasions.

We are satisfied that the proof of the charge of adultery alleged to have been committed on May 15th and the early morning of May 16th, 1933, was such as to lead the guarded discretion of a reasonable and just man to that conclusion (*Marchese* v. *Marchese, 98 N. J. Eq. 379*) ; that corroboration of the commission of the act charged was fully supplied by the surrounding circumstances and that the burden of proof cast upon petitioner was satisfactorily met.

The counter-claim for annulment was based upon the allegation that petitioner had committed fraud upon defendant in that petitioner had, some twelve years prior to the marriage, undergone an hysterectomy and was thereby prevented from bearing children to defendant and that she had withheld this fact from him at the time of entering into the marriage. Defendant testified that he had no knowledge of this condition until June 14th, 1933, shortly after the service upon him of a copy of the petition for divorce, when, in calling upon a Dr. Blaisdell to be treated for neuritis, the doctor, who had been the Osborne family physician for ten years, upon learning from defendant of the institution of the divorce proceeding, told defendant for the first time that which the doctor had known for several years, namely, that the doctor had learned of the hysterectomy from petitioner herself. The doctor testified that:

"He [Osborne] said he was in a jam. It annoyed him a great deal. My recollection of the conversation was something like this, that he came in for this treatment for neu-

ritis and I asked him how he was, and he said, 'well, look at this and see how you would feel if you were me.' I can't remember exact words. It showed he was in a rather bad situation. He seemed very much broken up over the thing, and in talking over their married life and discussing the general situation this information came out."

Mrs. Davis, on behalf of defendant, testified that she was a trained nurse and that shortly after the marriage of petitioner and defendant the witness was driving to a hospital with petitioner for the purpose of having X-rays taken of petitioner and that during the ride to the hospital petitioner confided to the witness that she had had this operation and cautioned the witness not to tell the defendant of it, the witness recalling that petitioner said "he does not know it and I don't want him to." This witness testified that she was on very friendly terms with defendant and she had known him for a longer period of time than she had known petitioner. Mr. Davis, the husband of this witness, also testified that he had known defendant "quite intimately" since about 1915, that he had known of the condition of petitioner through his wife and that he did not tell defendant of this condition until "sometime shortly after he had the papers served on him in this case." Mr. Davis had also learned of this condition from the lips of petitioner and also was besought by petitioner not to mention it to defendant, petitioner saying to this witness, "I'm depending on you not to say anything." He, notwithstanding his intimate friendship with defendant, never made mention of the situation because "I thought that was a personal and private matter I shouldn't butt into, so to speak."

On cross-examination as to his knowledge of the fact that petitioner had no menstrual periods, defendant stated that petitioner had told him, "when she was going to school she went to a dance and she took a cold bath and that prevented her and she never had periods since then," that he was satisfied with this explanation and never took petitioner to a physician regarding it. Defendant admitted, however, that prior to his marriage to petitioner, he took her to two phy-

sicians, one of whom was Dr. Blaisdell, because petitioner was having dizzy spells and "she was being doctored with a local doctor and I suggested that she see the family physician, Dr. Blaisdell, and upon that suggestion she let me take her over there." Defendant did not go into the doctor's office on these occasions but remained outside in his car.

Petitioner, in her own defense, on this phase of the case, testified that prior to the marriage she had advised her husband of this condition and he had agreed that this fact made no difference and that they would adopt two children, that she had never cautioned Mr. Davis nor his wife not to tell her husband of the condition but assumed they knew of it, and that at the time prior to the marriage when defendant took her to Dr. Blaisdell, it was for the express purpose of determining whether or not Dr. Blaisdell could help in this situation and it was then that she informed Dr. Blaisdell of her condition and gave the doctor permission to obtain the hospital records for further study of the case. This is corroborated by Dr. Blaisdell himself when asked by the court:

"The court—Q. How did you get this knowledge of the operation? A. Mrs. Osborne told me where she was operated on, she referred to the doctor and the hospital so I would understand her condition. I got the information directly from the doctor at the hospital with her permission."

Jennie Doremus, an entirely disinterested witness, testified that she had been a housekeeper for the mother of defendant and that she had been called into a room by her employer to take an order for dinner. As she came into the room defendant was in conversation with his mother and stated to his mother, in the hearing of the witness, that, "he was going to get married and his wife, Anna, couldn't have no children." Defendant denied that he had made such a statement and stated that the announcement of his marriage was made at the home of his sister, being supported in this by the sister, who testified that the announcement was made in her living room and that Mrs. Doremus was not present at that time, although the sister of defendant did not know of any other conversation defendant may have had with his mother regarding his approaching marriage.

It is the undoubted law that where a woman knows herself to be incapable of conceiving and bearing children and does not disclose that fact to her intended husband, the husband, upon learning of the fact, may, in an appropriate action, obtain a decree for annulment on the ground of fraud under the general equity jurisdiction of the chancery court. *Carris* v. *Carris, 24 N. J. Eq. 516; Turney* v. *Avery, 92 N. J. Eq. 473.*

But we are satisfied that no fraud was committed upon the defendant in the instant case. We have an abiding conviction that defendant knew of the existence of this condition prior to the marriage, that he did promise, in consideration of the marriage, to adopt two children, which in so far as the record discloses, he has not done and that in the trial of this action he has been guilty of palpable deceit.

Giving to the orders of the learned advisory master as contained in the decree *nisi,* his conclusions not being before us, every consideration and weight, we are, nevertheless, constrained irresistibly to the conclusion that the advisory master was in error in dismissing the petition of petitioner and in granting the decree of nullity on the counter-claim of defendant.

The matter is remanded to the court of chancery with instructions that a decree be entered granting a decree of divorce to petitioner on her petition and dismissing the counter-claim of defendant.

The decree below is reversed.

*For affirmance*—None.

*For reversal*—The Chief-Justice, Trenchard, Parker, Lloyd, Case, Bodine, Donges, Heher, Perskie, Hetfield, Dear, Wells, WolfsKeil, Rafferty, Cole, JJ. 15.